BEFORE THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

INSIGHT SECURITIES, INC. a
Delaware corporation and
INTELLIGENICS, INC., a Delaware
corporation,

    Plaintiffs,

Civil Action No. 20-23864-Civ-Scola

v.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, a New York Corporation,

    Defendant.
_____/

## AMENDED COMPLAINT

Plaintiffs, Insight Securities, Inc, a Delaware corporation ("Insight"), and Intelligenics, a Delaware Corporation ("Intelligenics), sue Defendant, Deutsche Bank Trust Company Americas, a New York corporation ("DBTCA"), and allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Insight is a Delaware corporation with its principal place of business in Highland Park, Illinois, where, in its capacity of a securities broker/dealer registered with the Financial Industry Regulatory Authority ("FINRA"), executes orders for the purchase and sale of securities for its customers as well as providing

1

custodial services. The transactions and transfers of securities involving Insight as detailed herein were effectuated in Miami, Florida.

2. Intelligenics is a Delaware non-public corporation with its principal place of business in Highland Park, Illinois, and is the sole owner of Insight.

3. DBTCA is a corporation incorporated under the laws of New York with its principal place of business at 60 Wall Street, New York, New York 10005. DBTCA operates as a bank, accepts deposits, makes loans, engages in private and commercial banking services, and provides discretionary and non-discretionary investment management services to private banking clients throughout the United States, including Florida. DBTCA maintains a prominent branch in Miami, Florida.

4. The activities alleged herein involving DBTCA, including, without limitation, the transfer and improper acceptance of securities into nonexistent accounts and the subsequent improper, unauthorized liquidation of those securities, emanated and occurred in DBTCA's Miami, Florida office via DBTCA officers and employees, Gloria Medina and Reinaldo Figueredo, who operated out of DBTCA's Miami, Florida office. All of the wrongful acts of DBTCA alleged herein occurred in Miami, Florida.

5. The amount in controversy exceeds $75,000.00, exclusive of interest and attorneys' fees.

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## BACKGROUND FACTS

### The Subject Accounts

*The Rado Account (with DBTCA)*

7. Rado Limited Partnership ("Rado") is a limited partnership established under the laws of New Zealand, with its principal place of business in Auckland, New Zealand.

8. On or about March 24, 2011, Rado opened a custody account with DBTCA (the "Rado Account").

9. At all relevant times, Biscayne Capital S.A. ("Biscayne") was Rado's independent investment advisor.

10. Fernando Haberer ("Haberer") was at all relevant times the principal of Biscayne and related by marriage to the beneficial owners of Rado.

11. In 2012, Rado provided Haberer with power of attorney to conduct trading activity in the Rado Account.

12. At all relevant times, Biscayne and Haberer engaged in the investment advisory business, and had power of attorney over the Rado Account.

### *The Bralisol Account (with Insight)*

13. Bralisol Associates, Ltd. ("Bralisol") is British Virgin Islands entity with its legal address in Tortola, British Islands.

14. In December 2016, Bralisol opened an account with Insight (the "Bralisol Account").

15. Bralisol executed a power of attorney providing Total Advisors, LLC, a Cayman Islands investment advisor ("Total"), with the authority to enter orders for the purchase and sale of securities in the Bralisol Account.

16. Haberer, the principal of Biscayne, was, at all relevant times, also the principal of Total.

### *The Clodi Account (with Insight)*

17. Clodi Holdings, Ltd. ("Clodi") is British Virgin Islands entity with its legal address in Tortola, British Islands.

18. In January 2017, Clodi opened an account with Insight (the "Clodi Account").

19. Clodi executed a power of attorney providing Total with the authority to enter orders for the purchase and sale of securities in the Clodi Account.

### *The Aparain Account (with Insight)*

20. Maria De Los Angeles Aparain Borjas ("Aparain") is an individual and citizen of Argentina.

21. In April 2017, Aparain opened an account with Insight (the "Aparain Account").

22. Aparain executed a power of attorney providing Total with the authority to enter orders for the purchase and sale of securities in the Aparain Account.

### Control of Accounts by Haberer

23. At all times relevant hereto, Haberer controlled the activities of both investment advisors Total and Biscayne, and had discretionary and trading authority over the Bralisol Account at Insight, the Clodi Account at Insight, and the Aparain Account at Insight.

24. In addition, at all relevant times, Haberer also controlled trading activities over the Rado Account at DBTCA.

### The Overarching Ponzi Scheme

25. Haberer and his cohorts, including Frank Chatburn ("Chatburn"), were at all times relevant hereto operating a Ponzi scheme involving notes issued by Biscayne Capital entities, ostensibly to develop real estate in Florida, including the Florida Keys. These notes, known as the Biscayne Proprietary Products ("BPP") were illiquid notes.

26. In the criminal case filed against him in the United States District Court for the Southern District of Florida, Case No. 18-20312, Chatburn elocuted in his guilty plea as follows:

> Beginning in or around and between 2005 and 2007, several individuals, whose identities are known to the United States and the defendant, began operating three businesses (whose names are also known by the defendant and the government): (a) Financial Services Firm; (b) a luxury real estate development company in South Florida; and (c) several private investment funds held in the Cayman Islands. These three businesses, though separate, were connected in that Financial Services Firm sold shares of the Cayman Islands investment funds for the ostensible purpose of developing the real estate projects in South Florida. The defendant was a financial advisor for Financial Services Firm and, by at least in or around 2014, was an approximately 8% shareholder. Shortly after the three businesses were formed, in or around 2007, the real estate projects began suffering financial difficulties that worsened over the next decade. Despite knowing of the failing financial health, and eventual insolvency, of the real estate projects, the co-conspirator owners and certain Financial Services Firm employees, including the defendant, continued to raise new debt, purportedly for the development of real estate, by: (a) aggressively selling the worthless funds' shares; (b) making false and fraudulent statements to auditors, clients and others, regarding the financial health of these investments; and (c) omitting material information regarding the conflict of interest among the various business lines, among other things.
>
> By the end of 2015, the beneficiary real estate project was at least approximately $200 million in debt and remained mostly undeveloped and unsold. The investment funds that were being raised were instead fraudulently used by the co-conspirators, including at the direction of the defendant: (a) to repay older debts; (b) to capitalize the consistently unprofitable businesses; and (c) for the co-conspirators own personal use and benefit. To perpetuate the investment fraud scheme, the coconspirators, at the direction of the defendant and others, would at times make interest payments to clients to deceive them into believing their investments were generating returns, when in

fact their money was not invested in real estate and was not generating returns.

*United States of America v. Frank Roberto Chatburn Ripalda*, Case No. 18-20312, filed in the United States District Court for the Southern District of Florida, Document No. 213.

### The Rado Account Overdraft

27. In January 2018, as part of the Ponzi scheme detailed above, Haberer, on behalf of Rado, knowingly directed DBTCA to buy approximately $12,349,000.00 of BPP (the "BPP Purchases") to be delivered to Rado's DBTCA account.

28. DBTCA made the BPP Purchases, however, the Rado Account lacked sufficient funds to cover the BPP Purchases; therefore, Haberer also requested DBTCA to sell other notes related to the BPP (the "Sale Orders") to fund the BPP Purchases.

29. The Sale Orders failed, however, ultimately placing the Rado Account at DBTCA in an overdraft situation totaling $12,349,000.00 (the "Rado Overdraft").

30. The $12,349,000.00 advanced by DBTCA was ultimately paid to entities owned, operated, or controlled by Haberer and his cohorts.

31. Thereafter, DBTCA demanded that Rado deposit funds or securities sufficient to pay the Rado Overdraft.

32. To satisfy DBTCA's demand that Rado repay the Rado Overdraft, Haberer improperly caused securities belonging to third parties and other clients of Haberer to be transferred to the Rado Account, including securities from the Clodi Account, the Bralisol Account, and the Aparain Account, each held at Insight.

33. To partially satisfy the Rado Overdraft, Haberer submitted four (4) forged transfer instructions to Insight, as follows: one (1) on March 8, 2018 for the Clodi Account; and three (3) on March 15, 2018, one each for the Clodi Account, the Bralisol Account, and the Aparain Account, as detailed below.

34. The transfer requests required use of the following two companies that are used to transfer securities to non-FINRA members (which can include foreign broker-dealers as well as domestic and foreign banks and trust companies): (1) the Depository Trust Company ("DTC"), which is a wholly owned subsidiary of The Depository Trust and Clearing Corporation, for securities traded in the U.S.; and (2) Euroclear, which is a Belgium-based financial services company used to effectuate securities transfers to non-FINRA members, for securities traded outside the U.S.

35. As detailed below, DBTCA improperly and negligently accepted forged transfers effectuated by Haberer, depositing securities into the Rado Account despite the transfer requests not identifying the Rado Account as the transfer account and disregarding the "for further credit" instructions transmitted

by Insight, concurrently with the deliveries, to post into non-existent accounts in the name of Clodi, Bralisol, and Aparain.

36. DBCTA then wrongfully sold those improperly transferred securities to partially satisfy the Rado Overdraft and cover its own losses, all as more specifically detailed below.

**The March 8, 2018 Transfer of Securities from the Clodi Account at Insight**

37. On March 8, 2018, Haberer caused a transfer request for $5,140,000.00 of the securities in the Clodi Account to be submitted to Insight (the "March 8 Transfer").

38. The March 8 Transfer request was purportedly signed by representatives of Clodi. *See* **Composite Exhibit "A"** hereto, which is incorporated by reference herein.

39. All of the securities listed in the March 8 Transfer, except one, were to be transferred via Euroclear.

40. The one (1) security in the Clodi Account as part of the March 8 Transfer to be transferred via DTC was: "US61746BDM54 MORGAN STANLEY FXD RT SR NT SER F 2.500% 01/24/19 B/E DTD 01/24/14 N/C 810,000.0000US61746BDM54 MORGAN STANLEY FXD RT SR NT SER F 2.500% 01/24/19 B/E DTD 01/24/14 N/C" (the "Morgan Stanley Notes"), with "DTC 987" and "BJ60" specified in the DTC delivery instructions, together with

the declaration that the transfer was FFC (for the further credit) of "FFC Clodi Holdings, Ltd. Account number AP***3."

41. "DTC 987" is the DTC clearing number for State Street Bank and Trust Company ("State Street"), DBTCA's clearing agent; "BJ60" identifies that the incoming transfer is for DBTCA.

42. State Street is an agent of DBTCA, and, at all times relevant hereto, State Street was acting within the scope of its agency with DBTCA; therefore, all actions of State Street as described herein are imputed to DBTCA, State Street's principal.

43. Based on the transfer request, via DTC, Insight processed the transfer of the above-alleged Morgan Stanley Notes, through "DTC 987" and for further credit to "Clodi Holdings, Ltd.," and specifying the receiving account number as AP***3.

44. On information and belief, State Street (DBTCA's clearing agent) received the DTC transfer of the Morgan Stanley Notes from Insight's clearing firm, Pershing, LLC, and informed DBTCA that it had received the $810,000.00 in Morgan Stanley Notes for the benefit of or for the credit to Clodi Holdings, Inc. account number AP***3.

45. At the time the March 8 Transfer was received, DBTCA was on actual notice that Rado lacked funds or additional securities to fund the securities

10

purchases that generated the Rado Overdraft, that any funds being sent to credit the Rado Account had to come from third parties, and that DBTCA would need to conduct anti-money laundering ("AML") due diligence before accepting the funds for crediting the Rado Account.

46. At the time of the March 8 Transfer was received, DBTCA was on notice that Clodi did not maintain any account at DBTCA, and that account number AP***3 was nonexistent at DBTCA.

47. As such, at the time of the March 8 Transfer was received, DBTCA was on notice that: (a) funds were being received for the benefit of and credit to a non-existent DBTCA account and customer; and (b) that Rado lacked the financial resources to fund the purchases ordered by Haberer, and, therefore, DBTCA should have rejected the March 8 Transfer.

48. DBTCA, failing to exercise due care and failing to follow its AML procedures, did not reject this the transfer via DTC of the $810,000.00 Morgan Stanley Notes.

49. Instead, DBTCA accepted the transfer of the Morgan Stanley Notes and deposited them in the Rado Account at DBTCA (not the instructed non-existent Clodi account).

50. Once the $810,000.00 Morgan Stanley Notes were deposited, DBTCA ordered the sale of the $810,000.00 Morgan Stanley Notes, and credited the sales

proceeds to the Rado Account to reduce the Rado Overdraft and DBTCA's own exposure.

51. On information and belief, DBTCA received, on or about March 9, 2018, virtually all of the remaining securities specified on the March 8 Transfer request that had been transferred via the Euroclear system, which were also transferred for the benefit of and credit to the non-existent Clodi account AP***3, which, having failed to exercise due care, DBTCA accepted and deposited the securities in the Rado Account at DBTCA.

52. Once the securities transferred from the Clodi Account via Euroclear were deposited, DBTCA ordered the sale these securities, and credited the proceeds to the Rado Account to reduce the Rado Overdraft.

53. Had DBTCA exercised due care and initially rejected the transfer via DTC of the $810,000.00 Morgan Stanley Notes, Haberer's scheme to submit additional forged transfer instructions would have been uncovered, the securities (both those transferred via DTC and those transferred by Euroclear) would have been returned, and Insight would not have processed any further transfer requests received by or through Haberer without verification from the account holder that the transfer request was genuine.

54. As a result of DBTCA' failure to reject the transfer via DTC of the $810,000.00 Morgan Stanley Notes and the remaining March 8 Transfer for the

benefit of and credit to the non-existent Clodi account AP***3, Haberer was able to submit three (3) additional forged transfer requests, as set forth below, further damaging Insight, Clodi, Bralisol, and Aparain.

### The March 15, 2018 Transfer of Securities from the Clodi Account, Bralisol Account, and Aparain Account at Insight

55. On March 15, 2018, Haberer caused three (3) additional forged transfer requests to be delivered to Insight, one for the Clodi Account, one for the Bralisol Account, and one for the Aparain Account (collectively, the "March 15 Transfers"). *See,* respectively, **Composite Exhibits "B," "C,"** and **"D"** attached hereto, which are incorporated by reference herein.

56. Each of the March 15 Transfers directed Insight to transfer securities from the respective Clodi Account, Bralisol Account, and Aparain Account to accounts in the same name (not in the name of Rado), non-existent accounts at DBTCA, as with the March 8 Transfer.

57. Unaware of the forgeries due to the previously alleged actions of DBTCA, Insight proceeded to follow industry standard practice and process the March 15 Transfers, as detailed herein.

### *The March 18 Clodi Securities Transfer*

58. As to the Clodi Account, the transfer request, as reflected in **Composite Exhibit "B,"** specified the transfer via the DTC of all the remaining securities in the Clodi Account at Insight, which are listed on the transfer request

with a total notational value of $607,450.00 (the "March 18 Clodi Securities Transfer").

59.     As with the March 8 Transfer, the March 18 Clodi Securities Transfer instructions were to Clodi's same name account, again specifying State Street's DTC clearing number, "DTC 987," and specifying "BJ60" for further credit to "Clodi Holdings, Ltd." for account number AP***3.

60.     As with the March 8 Transfer, and once again failing to exercise due care, DBTCA accepted the $607,450.00 March 18 Clodi Securities Transfer via DTC for the benefit of the non-existent Clodi account to be sold and the proceeds credited to reduce the Rado Overdraft.

### *The March 18 Bralisol Securities Transfer*

61.     As to the Bralisol Account, the transfer request, as reflected in **Composite Exhibit "C,"** specified the transfer of securities identified therein via the DTC with a total notational value of $1,169,145.00 (the "March 18 Bralisol Securities Transfer").

62.     As with the March 8 Transfer, the March 18 Bralisol Securities Transfer instructions were to Bralisol's same name account, specifying State Street's clearing number, "DTC 987", and specifying "BJ60" for further credit to "Bralisol Associates Ltd." for account number AP***5.

14

63. As with the March 8 Transfer, and once again failing to exercise due care, DBTCA accepted the $1,169,145.00 March 18 Bralisol Securities Transfer via DTC for the benefit of the non-existent Bralisol account to be sold and the proceeds credited to reduce the Rado Overdraft.

### *The March 18 Aparain Securities Transfer*

64. As to the Aparain Account, the transfer request, i.e., **Composite Exhibit "D,"** specified the transfer via DTC of all of the securities in the Aparain Account, except for "MUNICIPALIDAD DE LA CIUDAD DECORDOBA USO GLOBAL NT REGS 7.875% 09/29/24," which was transferred via Euroclear, in the total notational value of $687,976.00 (the "March 18 Aparain Securities Transfer").

65. As with the March 8 Transfer, the March 18 Aparain Securities Transfer instructions were to Aparain's same name account, specifying State Street's clearing number, "DTC 987", and specifying "BJ60" for further credit to "M Aparain Borjas" for account number AP***6.

66. As with the March 8 Transfer, and once again failing to exercise due care, DBTCA accepted the $687,976.00 March 18 Aparain Securities Transfer via DTC and Euroclear for the benefit of the non-existent Aparain account to be sold and the proceeds credited to reduce the Rado Overdraft.

67. Altogether, the total amount of securities received and improperly accepted by DBTCA, improperly deposited in the Rado Account, and improperly sold to reduce the Rado Account overdraft was approximately $7,604,571.00.

## COUNT I
### (Negligence)

68. Plaintiff reallages Paragraphs 1 through 67 as if fully set forth herein.

69. DBTCA is aware that securities brokerage firms and other financial institutions have an obligation to safeguard securities deposited with them and to only transfer or convey those securities upon the express direction of the owners of the accounts at those brokerage firms and other financial institutions.

70. DBTCA has an obligation to process any transfer of securities in strict accordance with the instructions specified in the transfer instructions received by DBTCA from the delivering institution, and, if DBTCA is unable to process the transfer in accordance with the instructions, is required to return such deliveries.

71. In processing transfers, DBTCA is obligated to adhere to its AML, know-your-customer ("KYC"), and source of funds procedures, as well as the various federal regulations related thereto.

72. When Insight sent the March 8 Transfer request and March 15 Transfers requests as to the non-existent Clodi account, the non-existent Bralisol account, and the non-existent Aparain account, respectively, DBTCA was

obligated to reject those transfers because neither Clodi, Bralisol, nor Aparain maintained any accounts at DBTCA.

73. Moreover, because the March 8 Transfer and March 15 Transfers were not same account name transfers, DBTCA was obligated pursuant to its AML, KYC, and sources of funds procedures required under the Bank Secrecy Act, 31 U.S.C. § 5311, et. seq., 12 U.S.C. §§ 1892b and 1951-1959 to confirm the identity of the remitting account holder and the legitimate business purpose of such transfer.

74. DBTCA failed to exercise due care in processing the March Transfer and March 15 Transfers.

75. It was reasonably foreseeable that, by failing to exercise due care in processing the March 8 Transfer and March 15 Transfers, and thus exercising control and dominion of the securities listed therein for the benefit of Rado, DBTCA's negligent acts would financially injure Insight, which had custody of those assets and had initiated the transfers.

76. Had DBTCA acted with reasonable care upon receiving the initial request to transfer the Morgan Stanley Notes for the credit to or benefit of the non-existent Clodi Holdings, Ltd., account number A****3, DBTCA would have learned that the transfer instructions were forged and that this transfer and all subsequent transfers were unauthorized, and, thus, should have been rejected.

77. Had DBTCA rejected the above March 8 Transfer, Insight would never had processed the March 15 Transfers.

78. DBTCA's negligence in processing the aforesaid March 8 Transfer and March15 Transfers caused Insight to incur damages.

79. DBTCA's negligence was the legal cause of Insight's alleged damages.

WHEREFORE, Plaintiff, Insight, prays that judgement be entered for Plaintiff and against Defendant, DBTCA, for damages, costs, attorneys' fees, and all other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Insight, demands a trial by jury of any issue triable.

DATED this 30th day of September, 2020.

Respectfully submitted,

/s/ Timothy J. Kiley
**Bradley M. Saxton, Esq.**
bsaxton@whww.com;
scolgan@whww.com; csmith@whww.com
**Timothy J. Kiley, Esq.**
tkiley@whww.com; acothran@whww.com
**WINDERWEEDLE, HAINES, WARD & WOODMAN, P.A.**
329 Park Avenue North, Second Floor
Winter Park, FL 32789
(407) 246-8672
**ATTORNEYS FOR PLAINTIFF**