BEFORE THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

INSIGHT SECURITIES, INC. a
Delaware corporation, and
INTELLIGENICS, INC., a Delaware
corporation,

     Plaintiffs,

                          Civil Action No. 20-23864-Civ-Scola

     v.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, a New York Corporation,

     Defendant.

_____/

## SECOND AMENDED COMPLAINT[1]

     Plaintiffs, Insight Securities, Inc, a Delaware corporation ("Insight"), and

Intelligenics, a Delaware Corporation ("Intelligenics), sue Defendant, Deutsche

Bank Trust Company Americas, a New York corporation ("DBTCA"), and allege

as follows:

## PARTIES, JURISDICTION, AND VENUE

     1.    Insight is a Delaware corporation with its principal place of business

in Highland Park, Illinois, where, in its capacity of a securities broker/dealer

registered with the Financial Industry Regulatory Authority ("FINRA"), executes

---

[1] This Second Amended Complaint is being filed pursuant to the Court's May 4, 2021 Order
[Doc. 45] (the "Order").  The filing of this Second Amended Complaint shall not be deemed to
be a waiver of Plaintiffs' right, which is expressly reserved, to appeal the Order at a later date.

orders for the purchase and sale of securities for its customers as well as providing custodial services. The transactions and transfers of securities involving Insight as detailed herein were effectuated in Miami, Florida.

2.     Intelligenics is a Delaware non-public corporation with its principal place of business in Highland Park, Illinois, and is the sole owner of Insight.

3.     DBTCA is a corporation incorporated under the laws of New York with its principal place of business at 60 Wall Street, New York, New York 10005. DBTCA operates as a bank, accepts deposits, makes loans, engages in private and commercial banking services, and provides discretionary and non-discretionary investment management services to private banking clients throughout the United States, including Florida. DBTCA maintains a prominent branch in Miami, Florida.

4.     The activities alleged herein involving DBTCA, including, without limitation, the transfer and improper acceptance of securities into nonexistent accounts and the subsequent improper, unauthorized liquidation of those securities, emanated and occurred in DBTCA's Miami, Florida office via DBTCA officers and employees, Reynaldo Figueredo ("Figueredo") and Gloria Molina ("Molina"), who operated out of DBTCA's Miami, Florida office. All of the wrongful acts of DBTCA alleged herein occurred in Miami, Florida.

5.      The amount in controversy exceeds $75,000.00, exclusive of interest and attorneys' fees.

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## BACKGROUND FACTS

### The Subject Accounts

### *The Rado Account (with DBTCA)*

7.      Rado Limited Partnership ("Rado") is a limited partnership established under the laws of New Zealand, with its principal place of business in Auckland, New Zealand.

8.      On or about March 25, 2011, Deutsche Bank Wealth Management ("DBWM") opened a worldwide custody account for Rado (the "Rado Account").

9.      Figueredo was the account executive that serviced the Rado Account on behalf of DBWM as well as for DBTCA.

10.      At all relevant times, Biscayne Capital S.A. (Uruguay) ("Biscayne") was Rado's independent investment advisor.

11.      Fernando Haberer ("Haberer") was at all relevant times the principal of Biscayne.

12.      Haberer is related by marriage to the beneficial owners of Rado.

13.     Rado provided Haberer with power of attorney to conduct trading activity in the Rado Account, and, on or about October 23, 2012, provided DBTCA with a trading authorization for the Rado Account in favor of Haberer and Biscayne.

14.     Thereafter, on February 18, 2016, Rado executed a new, superseding power of attorney for trading authority in favor of Haberer and Luciana Fernandez ("Fernandez").

15.     At all relevant times, Biscayne and Haberer engaged in the investment advisory business, and had power of attorney and trading authority over the Rado Account.

16.     From the opening of the Rado Account at DBTCA in 2011 through at least June of 2018, Harberer and/or Fernandez directed all of the purchases and sales of securities for the Rado Account through DBTCA and its employees Figueredo and/or Molina.

### The Bralisol Account (with Insight)

17.     Bralisol Associates, Ltd. ("Bralisol") is British Virgin Islands entity with its legal address in Tortola, British Islands.

18.     In December 2016, Bralisol opened an account with Insight (the "Bralisol Account").

19.     Bralisol executed a power of attorney providing Total Advisors, LLC, a Cayman Islands investment advisor ("Total"), with the authority to enter orders for the purchase and sale of securities in the Bralisol Account.

20.     Haberer, the principal of Biscayne, was, at all relevant times, also the principal of Total.

### *The Clodi Account (with Insight)*

21.     Clodi Holdings, Ltd. ("Clodi") is British Virgin Islands entity with its legal address in Tortola, British Islands.

22.     In January 2017, Clodi opened an account with Insight (the "Clodi Account").

23.     Clodi executed a power of attorney providing Total with the authority to enter orders for the purchase and sale of securities in the Clodi Account.

### *The Aparain Account (with Insight)*

24.     Maria De Los Angeles Aparain Borjas ("Aparain") is an individual and citizen of Argentina.

25.     In April 2017, Aparain opened an account with Insight (the "Aparain Account").

26.     Aparain executed a power of attorney providing Total with the authority to enter orders for the purchase and sale of securities in the Aparain Account.

5

**Haberer's Control of the Clodi Account,**
**the Bralisol Account, the Aparain Account, and the Rado Account**

27.     At all times relevant hereto, Haberer controlled the activities of both investment advisors, Total and Biscayne, and had discretionary and trading authority over the Bralisol Account, the Clodi Account, and the Aparain Account, each of which were held at Insight.

28.     In addition, at all times relevant hereto, Haberer also controlled trading activities over the Rado Account at DBTCA and was the principal person with whom DBTCA communicated regarding the Rado Account, via DBTCA employees Figueredo and/or Molina.

**The Overarching Ponzi Scheme**

29.     Haberer and his cohorts, including Frank Chatburn ("Chatburn"), were at all times relevant hereto operating a Ponzi scheme involving notes issued by Biscayne entities, ostensibly to develop real estate in Florida, including the Florida Keys.  These notes, known as the Biscayne Proprietary Products ("BPP"), were illiquid notes.

30.     In the criminal case filed against him in the United States District Court for the Southern District of Florida, Case No. 18-20312, Chatburn elocuted in his guilty plea as follows:

> Beginning in or around and between 2005 and 2007, several
> individuals, whose identities are known to the United States and the
> defendant, began operating three businesses (whose names are also

6

known by the defendant and the government): (a) Financial Services Firm; (b) a luxury real estate development company in South Florida; and (c) several private investment funds held in the Cayman Islands. These three businesses, though separate, were connected in that Financial Services Firm sold shares of the Cayman Islands investment funds for the ostensible purpose of developing the real estate projects in South Florida.  The defendant was a financial advisor for Financial Services Firm and, by at least in or around 2014, was an approximately 8% shareholder.  Shortly after the three businesses were formed, in or around 2007, the real estate projects began suffering financial difficulties that worsened over the next decade. Despite knowing of the failing financial health, and eventual insolvency, of the real estate projects, the co-conspirator owners and certain Financial Services Firm employees, including the defendant, continued to raise new debt, purportedly for the development of real estate, by: (a) aggressively selling the worthless funds' shares; (b) making false and fraudulent statements to auditors, clients and others, regarding the financial health of these investments; and (c) omitting material information regarding the conflict of interest among the various business lines, among other things.

By the end of 2015, the beneficiary real estate project was at least approximately $200 million in debt and remained mostly undeveloped and unsold. The investment funds that were being raised were instead fraudulently used by the co-conspirators, including at the direction of the defendant: (a) to repay older debts; (b) to capitalize the consistently unprofitable businesses; and (c) for the co-conspirators own personal use and benefit.  To perpetuate the investment fraud scheme, the coconspirators, at the direction of the defendant and others, would at times make interest payments to clients to deceive them into believing their investments were generating returns, when in fact their money was not invested in real estate and was not generating returns.

*United States of America v. Frank Roberto Chatburn Ripalda*, Case No. 18-20312,

filed in the United States District Court for the Southern District of Florida,

Document No. 213.

### The Applicable Regulatory Scheme

31.     Figueredo and Molina are and at all times relevant hereto were dual employees of both DBTCA and Deutsche Bank Securities, Inc. ("DBSI").

32.     FINRA has the primary responsibility for regulating DBSI, and, thus, the activities of Figueredo and Molina as employees of DBSI.

33.     As a FINRA member firm, DBSI is obligated to evaluate proposed activity of its associated persons to determine whether to properly characterized such activity as simply an outside business activity or whether it should be treated as an outside *securities activity* subject to FINRA Rule 3280.[2]  *See* Supplemental Material 01 to FINRA Rule 3270.

34.     Once the FINRA member firm determines that the outside activity of its registered representatives constitutes a private securities transaction (such as

---

[2] Rule 3280 pertains to *all* securities transactions other than those included in Rule 3210 (accounts owned by a registered representative or in which he or she has a beneficial interest and personal transactions in investment company and variable annuity securities). The current lack of exceptions to Rule 3280 for securities activities at affiliates of a member (here DBTCA) is noted in FINRA's proposed new rule addressing outside business and securities transactions. *See* FINRA Regulatory Notice 18-08. As the Notice states in pertinent part:

> The proposed rule would require registered persons to provide their members with prior written notice of a broad range of outside activities, while imposing on members a responsibility to perform a reasonable risk assessment *of a narrower set of activities that are investment related*, allowing members to focus on outside activities that are most likely to raise investor protection concerns. *The proposed rule also would generally exclude from the rule a registered person's* personal investments (sometimes referred to as "buying away") and *work performed on behalf of a member's affiliates*.

*Id*. at p. 2. (emphasis added).

Figueredo's and Molina's activities with DBTCA with respect to the Rado Account, as detailed herein), then FINRA Rule 3280 applies and controls.

35. Importantly, FINRA Rule 3280 defines a private securities transaction as any securities transaction outside the regular course or scope of an associated person's employment with a member firm.

36. Figueredo's and Molina's activities on behalf of DBTCA are an outside securities-related activity that must be supervised by DBSI.[3]

37. FINRA Rule 3280 requires that, *prior to* engaging in any private securities transaction, an associated person *shall* provide written notice to the member firm describing in detail the proposed transaction, the person's proposed role, and stating whether the associated person has received or may receive selling compensation in connection with the transaction.

38. The intent of FINRA Rule 3280 is to provide FINRA member firms the right to impose conditions upon each associated persons' participation in securities transactions away from the member firm, whether personally, or through affiliates (such as DBTCA) or non-affiliates, so as to provide member firms such

---

[3] The interpretations on private security transactions by FINRA's forerunner, the National Association of Securities Dealers" ("NASD"") have been utilized by NASD since the mid-seventies. The NASD issued NASD Rule 3040 in 1985, to formally address this issue. The rule promulgated in 1985 not only integrated the prior interpretations, which addressed only the responsibility of associated persons to notify their member firms of their private securities transactions, but also addressed supervisory and oversight responsibilities of member firms. *See* Private Securities Transactions Interpretation under Article III, Section 27 (attached as Exhibit 2 to NASD NTM 85-54).

as DBSI with the ability to supervise the securities activities of its registered representatives.[4]

39.     Those employees such as Figueredo and Molina who perform services for both DBTCA and DBSI are subject to "Dual-Hatting" procedures, which require that where an employee is involved in securities transactions the business must notify the department's compliance group and comply with policies and procedures of both departments.

40.     Here, DBTCA was responsible for ensuring that, in dealing with the Rado Account and its securities-related activities, including the purchase and sale of securities and the receipt of transferred securities, that Figueredo and Molina complied not only with DBTCA's procedures and the associated banking regulations and laws but also FINRA rules and SEC regulations as well.

**Figueredo's and Molina's Bad Acts and Glaring Omissions**

41.     DBTCA, through its employees Figueredo and Molina, both of whom worked in DBTCA's Miami, Florida office, ignored numerous red flags with respect to Haberer and Biscayne and, in June 2017, concealed failed trades in the Rado Account that, if accurately recorded, would have resulted in an immediate overdraft in the Rado Account in the amount of several millions of dollars, as further detailed below.

---

[4] FINRA Rule 3280 also imposed the obligation on registered representatives (such as Figueredo) to adhere to such conditions.

**Figueredo and Molina Purposefully Ignored Red Flags regarding the Inability to Price the BPP and the Reversal of BPP Interest Payments**

42.     Figueredo and Molina were aware that DBTCA's agent, State Street, was unable to price the BPP, and that DBTCA was therefore unable to issue account statements for the Rado Account.  The inability to obtain BPP pricing caused State Street to use "dummy" CUSIP numbers so that DBTCA could generate statements for the Rado Account.

43.     Figueredo and Molina ignored this red flag, and, rather than obtaining independent pricing, turned to, of all places, the firm at which Haberer and Fernandez worked, Biscayne, to obtain the prices for the very same securities that Haberer and Fernandez were purchasing for Rado pursuant to the power of attorney described above.

44.     Oblivious to the implications of these red flags, Figueredo and Molina continued to obtain prices for the BPP from Biscayne until they were told on or about April 24, 2018 by a supervisor that doing so was improper.

45.     Prices for the BPP were to come from either independent third-party pricing services, from fund investment managers, or marked "N/A."

46.     Biscayne was neither a third-party pricing service nor a fund investment manager, and, therefore, all of the BPP should have been marked as N/A.

47.     As set forth herein, giving rise to the Rado Account overdraft described below were sales of BPP that did not clear coupled BPP purchases.

48.     Had Figueredo and Molina marked the prices as "N/A" as they should have, none of the BPP could have been purchased until the sales cleared, and, as a result, there would not have been an overdraft in the Rado Account and Plaintiffs would ultimately not have incurred any damage.

49.     Indeed, the improper use of Biscayne for pricing of the BPP perpetuated the entire fiasco detailed below, resulting in the Rado Account overdraft at DBTCA and the subsequent improper transfer and clearing of securities from the Clodi Account, the Bralisol Account, and the Aparin Account to the Rado Account, all of which ultimately damaged the Plaintiffs.

50.     In addition to the pricing issues, in the second quarter of 2017, certain previous BPP interest payments to the Rado Account were reversed, causing the Rado Account to go into an overdraft situation—another red flag.

### Figueredo's and Molina's Manipulation of the Rado Account Statements to Conceal the Rado Account Overdraft Status

51.     In June 2017, Haberer entered a trade for the purchase of certain BPP products for the Rado Account to be financed by the sale of another BPP.

52.     The sell side of the BPP (a Diversified Real Estate note) failed as did a sale order for a more recent sale of the same BPP.

53.     These sales continued to fail for the next 75 days, meaning that Figueredo and Molina had manipulated both the trade and settlement dates for the sales for a month and a half to avoid having the Rado Account generate an overdraft.

54.     Worse, Figueredo and Molina processed another sale order involving BPP in September 2017, even though the previous sales had failed and knowing that Rado had no other funds to cover the purchases.[5]

### The December 2017 Rado Monthly Statement

55.     By mid-November 2017, two of the three failing sales of BPP in June 2017 totaling $4,000,000.00 had failed for five (5) months while the additional September 2017 sales (i.e., $1,000,000.00 sale of Diversified Real Estate notes and the $2,000,000.00 sale of GMS Global Market Step-Up notes) had failed for sixty-four (64) days, resulting in an overdraft.

---

[5] 31 CFR § 1023.210(b)(5) specifically requires broker-dealers (like DBSI whose procedures DBTCA must enfore pursuant to its dual Hatting Procedures) just like regulated financial institutions, to develop appropriate risk-based procedures for conducting ongoing customer due diligence. This includes understanding the nature and purpose of the customer relationship as well as conducting ongoing monitoring to identify suspicious activity. While specific triggering events for customer due diligence are not enumerated in the regulations, there are several widely accepted red flags which are agreed upon that require an additional review of an account. Identifying the source of funds of a customer and in a transaction is fundamental in any anti-money laundering program. FINRA itself has noted that "the… financial resources of the customer are not commensurate with the type or level of activity of the customer" is a potential red flag in its Regulatory Notice 19-18, Guidance to Firms Regarding Suspicious Activity Monitoring and Reporting Obligations. Moreover, internationally, the Financial Action Task Force (FATF) provides in its Guidance for A Risk-Based Approach for The Securities Sector that "a securities provider should take reasonable measures to establish the source of wealth and source of funds of relevant parties."

56.     DBTCA's back office provided Figueredo and Molina with two choices on November 9, 2017: (1) have Rado send in $3,000,000.00; or (2) delete/cancel the trades.

57.     To assist Haberer, Figueredo and Molina, acting on behalf of DBTCA, manipulated DBTCA's books and records to conceal the overdraft while, inexplicably, permitting Haberer to increase the potential overdraft by purchasing additional BPP in the Rado Account.

58.     Pursuant to the relevant rules, cancellations of transactions are supposed to be booked on the date of the cancellation, and, if the cancellation is to relate back to an earlier time, the entry is to be noted with "as of" a prior date "trade 'x' cancelled," with the entry appearing on the statement for the month during which the cancellation was processed.

59.     However, in the Rado Account, there are three (3) October 2017 cancellations recorded: (1) a reversal of the 09/13/17 sale of $1,000,000.00 in Diversified Real Estate Notes, *posted on 10/20/17*; (2) the reversal of the 09/13/17 sale of $2,000,000.00 GMS Global Market notes, *posted on 09/14/17*; and (3) the reversal of the 10/25/17 sale of $1,000,000.0 of IA Capital Structures notes, *posted the next day, 10/26/17*.

60.     Thus, while these trades were canceled and posted on 10/20/17, 9/14/17, and 10/26/17, respectively, the postings were withheld from processing

14

for up three (3) months in the case of the sale of the $2,000,000.00 GMS Global Market notes and two (2) months for the remaining two sales.  This was done so that the Rado Account would not be in a $4,000,000.00 overdraft situation until Figueredo and Molina permitted Haberer to engage in a December 1, 2017 resale of $1,000,000.00 in Diversified Real Estate Notes, $2,000,000.00 GMS Global Market notes, and $1,000,000.00 million of the IA Capital Structures notes, which were sold through a different broker/dealer and were recorded.  The "proceeds" of those "sales" then "offset" the reversals so that the Rado Account would not fall into a $4,000,000.00 overdraft situation.

61.    Figueredo and Molina then processed the following two new sales on 12/22/17: (1) $1,397,941.00 of Diversified Real Estate Notes; and (2) $1,600,00.00 of IA Capital Structures notes.  This enabled Haberer to purchase $3,000,000.00 of Preferred Income Collateralized notes, thus feeding an additional $3,000,000.00 into the Ponzi scheme.

62.    All of the "sales" referenced above were a charade because none of the sales could clear nor ever did clear.

63.    By December 2017, each of the aforementioned notes had been in default of its interest payment obligations for three fiscal quarters, which Figueredo and Molina knew or should have known because the only interest

recorded on the Rado Account monthly statements was for the purported accrued interest credit for the sales.

**DBTCA Ignores a Biscayne Capital Customer Complaint**

64.     At the end of November 2017, Figueredo and Molina received a complaint from another DBTCA customer over for whose account Biscayne also had trading authority and had used that authority to purchase some of the same BPP being purchased that were being financed in the Rado Account through the aforementioned failed sales.

65.     When Molina responded that to the customer that she had provided Biscayne with trading authorization, the customer vehemently denied that she had done so and demanded to know who authorized the purchases in her DBTCA account.

66.     Thus, one of the potential concerns voiced by DBTCA management back in 2016 when it had sought to revoke all of Biscayne's trading authority had now turned into reality.

67.     Despite this, DBTCA ignored this new red flag and dismissed the customer's concerns out of hand rather than escalating the complaint to senior management to investigate and remedy, together with the months of failed sell transactions in the Rado Account.

68.    Instead, DBTCA continued to manipulate its books in order to loan Rado, who was then in debt to DBTCA for over $4,000,000.00, another $8,000,000.00 during January 2018.

### The January 2018 Rado Monthly Statement

69.    Figueredo and Molina posted reversals of the 12/22/17 sale of $1,397,941.00 of Diversified Real Estate Notes and of $1,600,000.00 of IA Capital Structures notes on 12/29/17, but to avoid placing the Rado Account into a now $7,000,000.00 million overdraft situation, again withheld the posting until January 2018.

70.    Then, Figueredo and Molina simply resubmitted both sales, once again through a different purchasing broker, to avoid an overdraft.

71.    The result of all of the foregoing brought the funds paid into the Ponzi scheme to $12,300,593.00, leaving the Rado Account with an actual overdraft of $12,306,100.51 as of January 31, 2018.

72.    On February 12, 2018, as the four (4) trades again failed, DBTCA management mandated that the Rado Account could not have an overdraft and that the overdraft needed to be remedied.

### DBTCA Completely Disregards the Applicable Securities and Banking Regulations in its Zeal to Cover Rado's Overdraft

73.    With the sales of the BPP still failing, Figueredo informed Haberer on March 5, 2018 that if the BPP sales did not settle by the close of business on

March 7, 2018, DBTCA would have no choice but to begin liquidating positions the following morning in the Rado Account to satisfy the overdraft.

74.   Haberer responded by stating that he would send a document showing a snapshot of the accounts Haberer controlled so that DBTCA could see that Haberer could cover the overdraft.

75.   Haberer then provided statements to DBTCA showing assets of over $32,000,000.00 in one account and showing assets of approximately $6,500,000.00 for unknown individuals and/or entities.

76.   In conjunction with these statements, Haberer informed DBTCA that, if necessary, funds would be forthcoming from an unknown source under his control, a statement that should have immediately raised anti-money laundering red flags, which DBTCA purposefully ignored.

77.   Haberer then provided Figueredo a summary page for a J.P. Morgan account showing assets of almost $44,000,000.00 for some unknow individual or entity.

78.   Payments from unrelated third parties are widely accepted in the anti-money laundering industry as a red flag of possible money laundering.  As FINRA states, "wire transfers or payments made to or from unrelated third parties" as a potential red flag in money movement in its Regulatory Notice 19-18, Guidance to Firms Regarding Suspicious Activity Monitoring and Reporting Obligations.

79.     DBTCA made no attempt to discern from Haberer the identity of the owners of these referenced accounts, their relationship to Rado, or why they would be willing to pay off Rado's overdraft in the Rado Account.

**DBTCA Exercises Unauthorized Control Over a March 8, 2018 Transfer from Insight for the Benefit of Clodi**

80.     On March 7, 2018, in response to Figueredo having informed Haberer that unless funds were received, DBTCA would begin liquidating securities in the Rado Account, Biscayne advised Molina that it had instructions to transfer securities to the Rado Account at DBTCA.

81.     Thereafter, on March 8, 2018, Haberer caused Total to send a request to Insight to transfer securities out of Clodi's account with a nominal value of $5,140,000.00 (the "March 8 Transfer").

82.     The request sent by Haberer specified the Euroclear number previously supplied to Biscayne by Molina (no. 44382).  The transfer instructions stated that Insight was to transfer the securities FFC (for further credit) to "Clodi Holdings Ltd" with account no ("ACC #") AP2423, specifying a trade date ("T/D") of "3/8/18" and a settlement date ("S/D") of 3/9/18. Please include BJ60, account 33-3****1 in your delivery to DTC 987.

83.     Unknown to Insight, account 33-3****1 is the Rado Account number.

84.     Insight processed the transfer and certain securities involved were transferred via Depository Trust corporation ("DTC") to State Street, DBTCA's agent for DTC transfers.

85.     State Street, in turn, informed DBTCA that these DTC transfers were "FBO" (for the benefit of) "Clodi Holdings Ltd" and were "F/O/A Clodi Holdings Ltd" for A/C "AP***3" "FBO Clodi Holdings Ltd".

86.     DBTCA knew that Clodi did *not* maintain an account at DBTCA and that AP***3 was not a DBTCA account number.

87.     DBTCA had no document from Clodi authorizing DBTCA to exercise any control whatsoever over the transferred securities.

88.     Yet, rather than rejecting the March 8 Transfer, DBTCA exercised unauthorized control over these securities, deposited them into the Rado Account, and, without authority, ordered them sold, and then applied the proceeds to reduce the overdraft in the Rado Account for its own benefit and to the detriment of Clodi and Insight.

### DBTCA Exercises Unauthorized Control Over a March 15, 2018 Transfer for the Benefit of Clodi

89.     On March 15, 2018, Figueredo advised DBTCA as follows: (1) that most of the advisors had left Biscayne; and (2) that Biscayne was about to close. DBTCA ignored this red flag as well.

90.     On this same day, Insight received an instruction to transfer the remaining securities in the Clodi Account. This instruction, like the March 8 Transfer instruction, directed Insight to transfer the securities to "DTC 0987" for "FFC" to "Clodi Holdings Ltd" "ACCT AP***3.

91.     Once again, the transfer was sent to DBTCA's DTC transfer agent, State Street, who informed DBTCA that the securities were "F/O/A Clodi Holdings Ltd" for A/C "AP***5" "FBO Clodi Holdings Ltd".

92.     DBTCA, rather than rejecting the transfer, ignored the instructions and exercised unauthorized control over these securities, deposited them into the Rado Account, without authority ordered them sold, and then applied the proceeds to reduce the overdraft in the Rado Account for its own benefit and to the detriment of Clodi and Insight.

## DBTCA Exercises Unauthorized Control Over a March 15, 2018 Transfer for the Benefit of Bralisol

93.     Also, on March 15, 2018, Insight received instructions to transfer the securities in the Bralisol Account at Insight.

94.      Again, the transfers specified what turned out to be State Street DTC number "0987."

95.     The transfer request also instructed that the securities be sent "FFC Bralisol Associates Ltd" for account number AP***5.

96.     State Street informed DBTCA that the transfers were: F/A/O Brailsol Associates Ltd" for "A/C AP***5" and were "FBO Bralisol Associates Ltd."

97.     DBTCA knew that Bralisol did *not* maintain an account at DBTCA and that AP***5 was not a DBTCA account number.

98.     DBTCA had no document from Bralisol authorizing DBTCA to exercise any control, whatsoever, over the transferred securities.

99.     Yet, rather than rejecting the transfer, DBTCA exercised unauthorized control over these securities, deposited them into the Rado Account, without authority, ordered them sold, and then applied the proceeds to reduce the overdraft in the Rado Account for its own benefit and to the detriment of Bralisol and Insight.

### DBTCA Exercises Unauthorized Control Over a March 15, 2018 Transfer for the Benefit of Aparain

100.    On March 15, 2018, Insight received instructions to transfer out the securities in the Aparain Account specifying State Street's DTC number "0987".

101.    The transfer also instructed that the securities be sent "FFC M Aparain Borja" (sic).

102.    Insight processed the transfer specifying that the securities were to be for the credit of the Asparin Account (the "March 15 Transfer").

103.   On information and belief, State Street received the transfer and informed DBTCA that the transferred securities were F/A/O and FBO of M Asparain Borja A/C AP***6.

104.   DBTCA, knew that Asparin did *not* maintain an account at DBTCA and that AP***6 was not a DBTCA account number.

105.   DBTCA had no document from Asparin authorizing DBTCA to exercise any control, whatsoever, over the transferred securities.

106.   Yet, rather than rejecting the transfer, DBTCA exercised unauthorized control over these securities, deposited them into Rado's DBTCA account, without authority, ordered them sold, and then applied the proceeds to reduce the overdraft in the Rado Account and to the detriment of Aparain and Insight.

107.  The three (3) March 15, 2018 transfers described above are collectively referred to as the "March 15 Transfers."

108.   As a result of DBTCA's complete failure to account for the red flags detailed above and its knowing and willful acceptance into the Rado Account of the transfer of securities from the Clodi Account, Bralisol Account, and Aparain Account based on transfer instructions that did not identify the Rado Account (rather, the transfer instructions identified non-existent accounts), Plaintiffs, Clodi's, Bralisol's, and Aparain's broker/dealer, were ultimately damaged.

109.   All conditions precedent to the maintenance of this action have been performed, have occurred, or have been waived.

## COUNT I
### (Negligence)

110.   Plaintiff reallages Paragraphs 1 through 109 above as if fully set forth herein.

111.   DBTCA is aware that securities brokerage firms and other financial institutions have an obligation to safeguard securities deposited with them and to only transfer or convey those securities upon the express direction of the owners of the accounts at those brokerage firms and other financial institutions.

112.   DBTCA has an obligation to process any transfer of securities in strict accordance with the instructions specified in the transfer instructions received by DBTCA from the delivering institution, and, if DBTCA is unable to process the transfer in accordance with the instructions, is required to return such deliveries.

113.   In processing transfers, DBTCA is obligated to adhere to its AML, know-your-customer ("KYC"), and source of funds procedures, as well as the various federal regulations related thereto.

114.   When Insight sent the March 8 Transfer request and March 15 Transfers requests as to the non-existent Clodi account, the non-existent Bralisol account, and the non-existent Aparain account, respectively, DBTCA was

obligated to reject those transfers because neither Clodi, Bralisol, nor Aparain maintained any accounts at DBTCA.

115.   Moreover, because the March 8 Transfer and March 15 Transfers were not same account name transfers, DBTCA was obligated pursuant to its AML, KYC, and sources of funds procedures required under the Bank Secrecy Act, 31 U.S.C. § 5311, et. seq., 12 U.S.C. §§ 1892b and 1951-1959 to confirm the identity of the remitting account holder and the legitimate business purpose of such transfer.

116.   DBTCA failed to exercise due care in processing the March Transfer and March 15 Transfers.

117.   It was reasonably foreseeable that, by failing to exercise due care in processing the March 8 Transfer and March 15 Transfers, and thus exercising control and dominion of the securities listed therein for the benefit of Rado, DBTCA's negligent acts would financially injure Insight, which had custody of those assets and had initiated the transfers.

118.   Had DBTCA acted with reasonable care upon receiving the initial request to transfer the Morgan Stanley Notes for the credit to or benefit of the non-existent Clodi Holdings, Ltd., account number A****3, DBTCA would have learned that the transfer instructions were forged and that this transfer and all subsequent transfers were unauthorized, and, thus, should have been rejected.

25

119.   Had DBTCA rejected the above March 8 Transfer, Insight would never had processed the March 15 Transfers.

120.   DBTCA's negligence in processing the aforesaid March 8 Transfer and March15 Transfers caused Insight to incur damages.[6]

121.   DBTCA's negligence was the legal cause of Insight's alleged damages.

WHEREFORE, Plaintiffs prays that judgment be entered in their favor and against Defendant for damages, costs, attorneys' fees, punitive damages, and all other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Insight, demands a trial by jury of any issue triable.

DATED this 5th day of May, 2021.

Respectfully submitted,

/s/ Timothy J. Kiley
**Bradley M. Saxton, Esq.**
bsaxton@whww.com;
scolgan@whww.com; csmith@whww.com
**Timothy J. Kiley, Esq.**
tkiley@whww.com; acothran@whww.com
**WINDERWEEDLE, HAINES, WARD & WOODMAN, P.A.**
329 Park Avenue North, Second Floor

---

[6] Per agreement with counsel for DBTCA and in conformance with the parties' March 24, 2021 meet and confer conference held pursuant to this Court's March 18, 2021 Order on Plaintiffs' Motion for Leave to Amend [Doc. 40], paragraphs 120 and 121 of this Second Amended Complaint are amended from the proposed Second Amended Complaint attached to the Plaintiffs' Renewed Motion to Amend [Doc. 42] to omit the word "gross."

Winter Park, FL 32789
(407) 246-8672

Nicholas P. Iavarone (admitted *pro hac vice*)
niavarone@me.com
THE IAVARONE LAW FIRM, P.C.
561 Arbor Lane
South Elgin, Illinois 60177
(312) 637-9466

**ATTORNEYS FOR PLAINTIFF**